## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**STATE OF GEORGIA,**
c/o Strickland Brockington Lewis LLP
1170 Peachtree Street NE
Suite 2200
Atlanta, GA 30309-7200

      **Plaintiff,**

v.

**ERIC H. HOLDER, JR., in his official
capacity as Attorney General of the
United States,**
950 Pennsylvania Avenue, NW
Washington DC 20350

      **Defendant.**

**CIVIL ACTION FILE**

**NO._____**

**THREE JUDGE PANEL**

---

## EXPEDITED COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW THE STATE OF GEORGIA and, pursuant to Section 5 of

the Voting Rights Act of 1965, 42 U.S.C. § 1973c (hereinafter, "Section 5"), seeks

a declaratory judgment that Acts 1EX, 2EX, and 3EX of the 2011 Special Session

of the Georgia General Assembly (collectively the "2011 redistricting plans")

neither have the purpose nor will have the effect of denying or abridging the right

to vote on account of race or color under Section 5 of the Voting Rights Act of

1965, as amended and codified at 42 U.S.C. §1973c ("Section 5") . Alternatively,

the State of Georgia seeks a declaration that Section 5, as most recently amended

and renewed in the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting

Rights Act Reauthorization and Amendments Act of 2006, is unconstitutional and

its enforcement should be permanently enjoined.

## PARTIES

1.

This action is brought by Plaintiff the State of Georgia ("Georgia" or "the

State") on behalf of itself and its citizens, pursuant to Section 5 and 28 U.S.C. §

2201.

2.

Georgia is a State within the United States of America authorized to bring

this action on behalf of itself and its citizens.

3.

Defendant Eric H. Holder, Jr., Attorney General of the United States, is

charged with certain responsibilities pursuant to Section 5, including the defense of

a Section 5 declaratory judgment action brought in the United States District Court

for the District of Columbia.

## JURISIDICTION AND VENUE

4.

Section 5 prohibits a State or political subdivision subject to Section 4(b) of

the Voting Rights Act, 42 U.S.C. § 1973b(b) (hereinafter, "Section 4"), from

enforcing "any voting qualification or prerequisite to voting; or standard, practice, or procedure with respect to voting different from that in force and effect on November 1, 1964" unless it has obtained a declaratory judgment from the United States District Court for the District of Columbia that such change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or has submitted the proposed change to the Attorney General of the United States and the Attorney General has not objected to it.

5.

Under 42 U.S.C. § 1973b(b), the State of Georgia is a covered jurisdiction subject to the preclearance requirement of Section 5 because in 1965 (1) the Attorney General determined that Georgia "maintained on November 1, 1964, any test or device," and (2) the Director of the Census determined "that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964." 28 C.F.R. pt. 51, Appendix (2010).

6.

Forty-five years later, based on the very same formula originally implemented in 1965 and still found in Section 4, Georgia remains a covered jurisdiction subject to the preclearance requirements of Section 5, originally intended as a temporary, emergency provision.

7.

Georgia brings this action pursuant to Section 5 and 28 U.S.C. § 2201,

seeking declaratory judgment that its 2011 redistricting plans neither have the

purpose nor will have the effect of denying or abridging the right to vote on

account of race or color, thereby allowing the State to enforce its revised district

boundaries.

8.

The Court has subject matter jurisdiction of this action under Section 5 and

28 U.S.C. § 1331 because an actual controversy exists between the parties

regarding the State's ability to enforce certain procedures at issue in this litigation.

9.

Venue and jurisdiction are proper in this Court pursuant to Section 5 and 28

U.S.C. § 2284.

10.

This action is properly determinable by a district court of three judges in

accordance with Section 5 and 28 U.S.C. § 2284.

## FACTS

### Background

#### 11.

On March 17, 2011, the State received its updated count for the 2010 Decennial Census from the U.S. Census Bureau that the State's population had increased to 9,687,653.

#### 12.

That total population entitled the State to one additional Representative in the United States House of Representatives, for a total of 14.

#### 13.

In light of the growth in population and the additional Congressional district, the state's House, Senate, and congressional districts were malapportioned, requiring the State to redraw those districts to comply with constitutional standards. The State undertook this responsibility in a special session of the Georgia General Assembly held from August 15 until August 31, 2011.

#### 14.

Following the release of the Census and prior to the Special Session, the Chairmen of the Senate Redistricting and Reapportionment Committee and the House Legislative and Congressional Reapportionment Committee sought input

from committee members regarding the locations for public hearings to gather input from citizens regarding redistricting.

15.

After receiving that input, the Chairmen of the Senate Redistricting and Reapportionment Committee and the House Legislative and Congressional Reapportionment Committee then scheduled and held twelve joint hearings across the state in the following cities: Athens (May 16, 2011), Augusta (May 17, 2011), Savannah (May 18, 2011), Albany (May 23, 2011), Valdosta (May 24, 2011), Columbus (June 6, 2011), Cartersville (June 7, 2011), Macon (June 13, 2011), Stockbridge (June 14, 2011), Dalton (June 20, 2011), Gainesville (June 21, 2011), Atlanta (June 30, 2011).

16.

A majority of the members of the bipartisan House and Senate legislative reapportionment committees attended each of the public hearings.

17.

Video recordings of each public hearing were made and posted to the legislative website immediately. *See Georgia General Assembly Website*, http://www1.legis.ga.gov/legis/2011_12/house/Committees/reapportionment/gahlc rCalendarJT.html (Last Visited September 28, 2011).

6

18.

After the public hearings had been held, the Senate and House Committees met and adopted guidelines for redistricting. A copy of the Senate committee guidelines is attached as Exhibit 1. A copy of the House committee guidelines is attached as Exhibit 2.

19.

On August 10, 2011, Georgia Governor Nathan Deal issued a call to legislators for a special session to consider redistricting, among other issues. A copy of the Call is attached as Exhibit 3.

20.

Pursuant to the Governor's Call, the Georgia General Assembly convened on August 15, 2011 to begin its consideration of redistricting plans.

21.

Under Section 5 of the Voting Rights Act, Plaintiff cannot implement the 2011 redistricting plans for the Senate, House, or Georgia's congressional districts, unless and until this Court enters a declaratory judgment, as prayed for by Plaintiff, or the Attorney General otherwise agrees to the preclearance of the redistricting plans.

22.

All Senators and Representatives in the Georgia General Assembly, as well as Georgia's delegation in the United States House of Representatives, serve for two years, with qualifying and election to the Georgia State Senate, the Georgia House of Representatives, and the United States House of Representatives occurring in the even-numbered years.

23.

State law provides that candidates for both the Democratic and Republican nominations for all 180 seats in the Georgia House of Representatives, all 56 seats of the Georgia Senate, and all 14 seats designated to Georgia in the United States House of Representatives must qualify from May 23-25, 2012.

24.

Under state law, the general primary to nominate candidates for each major political party to the Georgia General Assembly and the United States House of Representatives will be held on July 31, 2012, to be followed by the general election on November 6, 2012.

25.

It is of the utmost importance that this Court act upon Plaintiff's claims at the earliest practicable date, so that the merits of Plaintiff's claims can be decided in sufficient time to allow for candidates for election to the Georgia General

Assembly and the United States House of Representatives to qualify to run in the state's general primary.

### State House of Representatives Redistricting Plan

26.

The State House of Representatives consists of 180 members, each of whom represents a single member district.

27.

House Chairman Roger Lane met with members from bipartisan delegations from across the state to discuss redistricting and their suggestions for the districts they represent.

28.

Representative Lane met with 179 of the 180 members of the state House of Representatives to discuss their districts; the remaining member, the House Democratic Leader, chose not to attend any meetings to discuss redistricting.

29.

Prior to the start of the special session to consider redistricting, Representative Lane released a draft state House redistricting plan for public comment.

30.

The House Committee met on August 16, 2011 to consider the draft plan; the House Committee voted down a proposed amendment and recommended the entire House pass the draft plan, House Bill 1EX.

31.

HB 1EX passed the House of Representatives by vote of 108-64.  HB 1EX then passed the Senate by vote of 36-16.

32.

The Governor of Georgia signed HB 1EX into law on August 24, 2011, as Act 1EX (the "House plan" or the "House redistricting plan").  A map depicting the House plan, along with a summary report of the population statistics for that plan, is attached as Exhibit 4.  A certified copy of Act 1EX is attached as Exhibit 5.

33.

The existing or "benchmark" plan for the House of Representatives is a largely a court-drawn plan with minor revisions subsequently made by the General Assembly.  In 2004, a three-judge federal court in *Larios v. Cox*, 314 F.Supp.2d 1357 (N.D. Ga. 2004), created the court-drawn plan; in 2006, the Georgia General Assembly slightly revised that court-drawn plan pursuant to Act 435 and obtained preclearance from the Attorney General on April 20, 2006. A map depicting the

benchmark House plan, along with a summary report of the population statistics

for that plan, is attached as Exhibit 6.

34.

Under the benchmark plan for the state House, there are 49 districts in which

over 50% of the total population of the district is African-American, i.e., they are

majority-minority districts.  Under the 2011 House plan, there are also 49 majority-

minority districts based on total population.

35.

Under the benchmark plan for the state House, there are 45 majority-

minority districts based on voting age population.  Under the 2011 House plan,

there are 47 majority-minority districts based on voting age population.

36.

Under the benchmark plan for the state House, there are 43 majority-

minority districts based on the numbers of African-Americans registered to vote in

2010.  Under the 2011 House plan, there are 49 majority-minority districts based

on 2010 those voter registration statistics.

### State Senate Redistricting Plan

37.

The State Senate consists of 56 members, each of whom represents a single

member district.

11

38.

Senate Chairman Mitch Seabaugh met with 51 of the 55 then-serving Senators for their input regarding their districts. Four senators chose not to meet with Senator Seabaugh to discuss the districts they represented.

39.

Following the meetings, Senator Seabaugh prepared a draft Senate redistricting plan based on the input from his colleagues in the Senate.

40.

Prior to the start of the special session to consider redistricting, Senator Seabaugh released the draft Senate redistricting plan for public comment.

41.

The Senate Committee met on August 16, 2011, considered the proposed Senate plan and recommended the entire Senate pass the draft plan, Senate Bill 1EX.

42.

SB 1EX passed the Senate by vote of 35-18.  SB 1EX then passed the House of Representatives by vote of 104-56.

43.

The Governor of Georgia signed SB 1EX into law on August 24, 2011, as Act 2EX (the "Senate plan" or the "Senate redistricting plan").  A map depicting

the Senate plan, along with statistics for that plan, is attached as Exhibit 7.  A

certified copy of Act 2EX is attached as Exhibit 8.

44.

The existing, or "benchmark" plan for the Senate is a largely a court-drawn

plan with minor revisions subsequently made by the General Assembly.  In 2004, a

three-judge federal court in *Larios v. Cox*, 314 F.Supp.2d 1357 (N.D. Ga. 2004),

created the court-drawn plan; in 2006, the Georgia General Assembly slightly

revised that court-drawn plan pursuant to Act 436 and obtained preclearance from

the Attorney General on April 20, 2006.  A map depicting the benchmark Senate

plan, along with statistics for that plan, is attached as Exhibit 9.

45.

Under the benchmark plan for the state Senate, there are 14 majority-

minority districts based on total population.  Under the state Senate plan, there are

15 majority-minority districts based on total population.

46.

Under the benchmark plan for the state Senate, there are 13 majority-

minority districts based on voting age population.  Under the state Senate plan,

there are 15 majority-minority districts based on voting age population.

47.

Under the benchmark plan for the state Senate, there are 12 majority-minority districts based on 2010 voter registration.  Under the state Senate plan, there are 15 majority-minority districts based on 2010 voter registration.

## Congressional Redistricting Plan

48.

With input from the public, members of the General Assembly and the Governor, the House and Senate chairmen jointly drafted a congressional plan that complied with the principles adopted by their respective committees.

49.

The House and Senate jointly released the draft congressional plan to the public on August 22, 2011.

50.

After receiving input on the draft plan that had been released, the House Committee met and adopted four changes to the draft plan before recommending the entire House vote for the draft plan, House Bill 20EX.

51.

The Senate Committee recommended the entire Senate vote for the congressional plan as passed by the House.

52.

HB 20EX passed the House of Representatives by vote of 110-60.  HB 20EX passed the Senate by vote of 34-21.

53.

The Governor of Georgia signed House Bill 20EX into law on September 6, 2011, as Act 3EX (the "congressional plan" or the "congressional redistricting plan").  A map depicting the congressional plan, along with statistics for that plan, is attached as Exhibit 10.  A certified copy of Act 3EX is attached as Exhibit 11.

54.

The existing, or "benchmark" state congressional plan was created by the General Assembly in its 2005 regular session as Act 146.  The benchmark plan was precleared by the Attorney General on September 30, 2005. A map depicting the benchmark congressional plan, along with a summary report of the population statistics for that plan, is attached as Exhibit 12.

55.

Under the benchmark plan for congressional districts, there are three majority-minority districts based on total population.  Under the congressional plan, there are four majority-minority districts based on total population.

56.

Under the benchmark plan for congressional districts, there are two majority-minority districts based on voting age population.  Under the congressional plan, there are three majority-minority districts based on voting age population.

57.

Under the benchmark plan for congressional districts, there are two majority-minority districts based on 2010 voter registration.  Under the congressional plan, there are four majority-minority districts based on voter registration.

## COUNT I – DECLARATORY JUDGMENT REGARDING STATE HOUSE OF REPRESENTATIVES REDISTRICTING PLAN

58.

The allegations of Paragraphs 1 through 57 are incorporated as if fully set forth herein.

59.

The State of Georgia did not adopt the state House redistricting plan with any discriminatory purpose.

60.

The state House redistricting plan, when compared to Georgia's existing or "benchmark" state House plan, does not lead to "retrogression" in the position of racial minorities in that it does not have the effect of denying or abridging the right to vote on account of race or color.

61.

The State of Georgia is therefore entitled to a judgment that the state House redistricting plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color under Section 5 of the Voting Rights Act of 1965, as amended, and that such legislation may be implemented without further delay.

## COUNT II – DECLARATORY JUDGMENT REGARDING STATE SENATE REDISTRICTING PLAN

62.

The allegations of Paragraphs 1 through 61 are incorporated as if fully set forth herein.

63.

The State of Georgia did not adopt the state Senate redistricting plan with any discriminatory purpose.

64.

The state Senate redistricting plan, when compared to Georgia's existing or "benchmark" state Senate plan, does not lead to "retrogression" in the position of racial minorities in that it does not have the effect of denying or abridging the right to vote on account of race or color.

65.

The State of Georgia is therefore entitled to a judgment that the state Senate redistricting plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color under Section 5 of the Voting Rights Act of 1965, as amended, and that such legislation may be implemented without further delay.

## COUNT III – DECLARATORY JUDGMENT REGARDING CONGRESSIONAL REDISTRICTING PLAN

66.

The allegations of Paragraphs 1 through 65 are incorporated as if fully set forth herein.

67.

The State of Georgia did not adopt the congressional redistricting plan with any discriminatory purpose.

68.

The congressional redistricting plan, when compared to Georgia's existing or "benchmark" congressional plan, does not lead to "retrogression" in the position of racial minorities in that it does not have the effect of denying or abridging the right to vote on account of race or color.

69.

The State of Georgia is therefore entitled to a judgment that the congressional redistricting plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color under Section 5 of the Voting Rights Act of 1965, as amended, and that such legislation may be implemented without further delay.

## COUNT IV – DECLARATORY JUDGMENT

70.

The allegations of Paragraphs 1 through 69 are incorporated as if fully set forth herein.

71.

If this Court declines to enter a declaratory judgment finding that all of the 2011 redistricting plans neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color under Section 5, then, alternatively, the State of Georgia seeks declaratory judgment that the

continued application of Section 5 to the State is an unconstitutional imposition on the sovereignty of the State of Georgia, is beyond Congress's authority, and therefore is a violation of the Tenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

72.

When first adopted in 1965, Section 5 was intended as a temporary measure necessary to address pervasive racial discrimination in the election process which existed in some areas of the country, including Georgia.

73.

When Congress originally enacted the "temporary" preclearance requirements of Section 5 and even as late as the reauthorization of those provisions in 1982, the conditions justifying the imposition of the preclearance requirements upon Georgia either existed or existed in very recent memory.

74.

However, when reauthorizing Section 5 in 2006, Congress continued to base preclearance coverage on a formula based on the 1964, 1968, and 1972 Presidential elections, leaving the State of Georgia in the status of a covered jurisdiction, while not covering other States or portions of States that would have been covered under any modern measure that Congress might reasonably have imposed.

75.

The State of Georgia and its voters are being subjected to the continued extraordinary intrusion into its constitutional sovereignty through Section 5 and its outdated preclearance formula based upon discriminatory conditions that existed more than forty-seven years ago but have long since been remedied, while jurisdictions where similar discriminatory conditions currently *do* exist are not subject to any federal interference under Section 5 simply because the current discriminatory conditions did not exist or were overlooked when Section 5 coverage was originally determined almost a half-century ago.

76.

Individuals who were not even alive when the Voting Rights Act was passed are voting and are penalized for those conditions that existed forty-seven years ago.

77.

Congress's 2006 reauthorization of Section 5 was a disproportionate, irrational, and incongruous remedy for a perceived harm, measured by a more than forty-seven year old formula, which, if updated to today, would not cover the State of Georgia.

78.

Unlike other provisions of the Voting Rights Act, Section 5 is no longer a "congruent and proportional" remedial exercise of Congress's enforcement power.

79.

Unlike Section 5, Section 2 of the Voting Rights Act is not temporary, applies to all States uniformly, and can be used to address the same discriminatory voting practices Section 5 was designed to prevent.

80.

Therefore, as applied to the State of Georgia, the preclearance requirements of Section 5 violate the Tenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

81.

Georgia voters and the State itself are harmed by the overreach of Section 5 because the State cannot make *any* adjustments to *any* elections practice or procedure without the prior approval of the federal government, despite the fact that there is no current cause for such oversight.

82.

Continued imposition of the preclearance requirement on Georgia hinders the right of Georgia voters to decide the manner in which their representation at the local level will be determined—that is, to alter the manner and procedures by which their representatives in the State are elected—because the preclearance procedures are costly and burdensome.

83.

Bailout under 42 U.S.C. § 1973c is not an option for the State of Georgia

because, within the last ten years, the DOJ lodged objections against the State's

original submission and request for reconsideration of the Georgia HAVA

Verification Process (which was later precleared) and against voting changes of

four subjurisdictions within the State of Georgia.

84.

The State of Georgia has almost 900 subjurisdictions, including counties,

cities, school board and local authorities.

85.

Because these subjurisidictions are independent political subdivisions

empowered to enact their own ordinances and make a multitude of policy decisions

which might affect election practices or procedures, none of which are reviewed or

controlled by the State of Georgia, the bailout standards of Section 5 set a standard

for the State which is virtually impossible to meet.

86.

As applied to the State of Georgia, Section 5 lacks any continuing

justification and is nothing more than a scarlet letter that Congress, without any

cognizable justification, has chosen to continue to place on the State to punish it

for conditions that existed more than forty-seven years ago but do not exist today.

87.

Congress cannot forever rely on findings of conditions that existed forty-seven years ago to continue to justify the use of its Fifteenth Amendment enforcement power in a way that infringes on the rights of an entire generation of voters who were not even alive when those discriminatory practices were ended.

WHEREFORE, the State of Georgia respectfully prays that this Court:

(A)    Convene a three-judge District Court to hear the matters raised by the State of Georgia's Complaint;

(B)    Enter such other and further orders as may be necessary during the pendency of this case to ensure that it be handled as expeditiously as possible;

(C)    Enter a declaratory judgment that the state House redistricting plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, and that the statute may be enforced by Plaintiff without any impediment on account of Section 5 of the Voting Rights Act of 1965, as amended;

(D)    Enter a declaratory judgment that the state Senate redistricting plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, and that the statute may be enforced by Plaintiff without any impediment on account of Section 5 of the Voting Rights Act of 1965, as amended;

(E)     Enter a declaratory judgment that the congressional redistricting plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, and that the statute may be enforced by Plaintiff without any impediment on account of Section 5 of the Voting Rights Act of 1965, as amended;

(F)     In the event the Court finds any one of the 2011 redistricting plans does not meet the requirements for preclearance under Section 5, enter a declaratory judgment that Section 5 is an unconstitutional extension of Congress's enforcement power to remedy past violations of the Fifteenth Amendment and enjoin further enforcement of Section 5; and

(F)     Grant the State of Georgia such other, further, and different relief as this Court may deem just and proper.

This 5th day of October, 2011.

Respectfully submitted,

SAMUEL S. OLENS
Attorney General
Georgia Bar No. 551540
DC Bar No. 396285
DENNIS R. DUNN
Senior Deputy Attorney General
Georgia Bar No. 234098

ANN S. BRUMBAUGH
Assistant Attorney General
Georgia Bar No. 090598

Department of Law
State of Georgia
40 Capitol Square, S.W.
Atlanta, GA  30334-1300
Telephone: 404.656.5614
Facsimile: 404.657.9932
ddunn@law.ga.gov

Anne W. Lewis
Special Assistant Attorney General
Georgia Bar No. 737490
Frank B. Strickland
Special Assistant Attorney General
Georgia Bar No. 687600
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411

STRICKLAND BROCKINGTON
   LEWIS LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street, NE
Atlanta, Georgia  30309
Telephone: 678.347.2200
Facsimile:  678.347.2210
awl@sbllaw.net

*Attorneys for the State of Georgia,*
*Appearing Pursuant to LCvR 83.2(f)*